UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

JOE CORONADO,

          Petitioner,

     v.

JEFFREY A. BEARD,

          Respondent.

No. 1:15-cv-00045-LJO-SKO HC

**FINDINGS AND RECOMMENDATION THAT PETITION FOR WRIT OF HABEAS CORPUS BE DENIED**

Petitioner, Joe Coronado, a state prisoner proceeding *pro se* with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, presents three grounds for habeas relief: (1) his Fourteenth Amendment rights were violated when the prosecutor excused a juror for improper reasons and the trial court denied his *Batson/Wheeler* motion; (2) prosecutorial misconduct; and (3) ineffective assistance of counsel. The Court referred the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304. The undersigned recommends that the Court deny the petition.

## I.    <u>Factual Background</u>[1]

During the afternoon and evening of September 26, 2009, Johnny Elizalde ("Elizalde") threw a birthday party at his Bakersfield home for himself and his nieces. Bakersfield was a southern gang territory. Petitioner and his two co-defendants, Hilario Torres ("Torres") and Allen

---

[1] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Coronado* (Cal. Ct. App. July 1, 2013) (No. F062077), is presumed to be correct. 28 U.S.C. § 2254(e)(1).

Rivas ("Rivas"), were among the 30 to 60 friends and family members who attended. Elizalde invited Petitioner to the party. Elizalde knew Petitioner because Petitioner lived down the street from Elizalde for several years. Although he had not been involved with a gang for 20 years, Elizalde grew up in "the Colonia Chiques," a southern gang in Ventura County, California. Elizalde was familiar with the "Okie Bakers," a south side gang who "used to kick it with the Colonia."

Elizalde's wife, Claudia, and her family, including her brothers Ricardo and René Serrano, were from Delano.[2] Elizalde was aware that Delano was northern territory and there was a rivalry between southern and northern Hispanic gangs. Although Elizalde had never seen Claudia, Ricardo, or René involved with gang related activities, members of the Serrano family would often throw signs with their hands, like a one and a four, at parties.[3] Elizalde contended that they were just "messing around."

At the party, Elizalde was wearing a Raiders jersey, Ricardo was wearing a 49ers shirt, and Petitioner was wearing a Pittsburgh Steelers jersey. Elizalde stated that the party was not a gang party and "everybody uses Niners" without it making them a "14."[4] Torres was wearing a white tank top with a blue rag around his neck and Rivas was wearing a gray polo or t-shirt.

During the party, Elizalde's family was singing and dancing in the backyard. Once the music stopped, Ricardo and his wife, Yolanda, returned to an area where they had been sitting. As they were returning to their seats, Rivas approached Ricardo, tapped him on the shoulder, and asked if he could speak with him, while pointing toward the garage. Ricardo and Yolanda walked toward the garage to speak with Rivas. Yolanda felt that something was not right and had "sensed something weird" when Petitioner, Rivas, and Torres arrived at the party. Yolanda

---

[2] The Court will use the Serrano family members' first names for the sake of clarity.
[3] Northern gangs associate with the number 14.
[4] The color red is also associated with Northern gangs.

2

believed individuals wearing "wife beater" shirts with bandanas around their necks were part of gangs. She caught Petitioner, Rivas, and Torres "just staring over" at her group.

In the garage, Rivas asked Ricardo why Ricardo was throwing gang signs. Ricardo asked Rivas what he was talking about, said he was there with his family having a good time, and asked what Rivas wanted to do. Ricardo contended he had not thrown gang signs and interpreted Rivas' question as a challenge to fight. During the conversation, Yolanda noticed Torres and Petitioner standing an inch or two from her, looking upset. Yolanda was uncomfortable due to Torres' outfit because she associated his white tank top and blue rag with gang members; she was also concerned because Petitioner and Torres joined Rivas in the garage.

Yolanda yelled at Rivas that if he wanted anything done or to cause any trouble, he should leave, because it was her sister-in-law Claudia's house and they did not go to the house to cause problems. Rivas responded, "let's take it outside," and started walking out of the garage to the street. Yolanda turned to Torres and Petitioner, who put their hands up, as if to show they were not going to cause any trouble. Torres told her, "no, no, no, it's cool," while Petitioner stated that nothing was going to happen. Yolanda saw Rivas walk out of the garage followed by Torres and Petitioner, and held onto Ricardo so that he would not follow them.

Later in the evening, around 10:00 p.m., Claudia's brother, René, was dancing when someone told him that his brother, presumably Ricardo, was in an argument in the front of the house. René walked through the garage to the front of the house. René's son, Daniel, approached Rivas, because he believed Ricardo needed help. As Daniel stood on the sidewalk looking into the street, Rivas struck him once or twice in the jaw without provocation; neither had spoken to the other prior to the fight. Daniel and Rivas began to fight. Yolanda later told police officers that Rivas, Torres, and Petitioner were all on the street, but Elizalde stated he had not seen Torres or Petitioner.

René walked toward his son, Daniel, but René's attention was drawn away and he turned and walked quickly toward Petitioner.[5]  René walked in a manner that led witnesses to believe that René and Petitioner were going to fight.  Vanessa Serrano, a party attendee, saw Petitioner pull a small black gun from his waist, point it at René, and shoot him once in the stomach.  Flores did not see the gun, but saw the flame come out of the barrel, and estimated that Petitioner shot René when the two were about four feet apart.[6]  After firing the shot, Petitioner walked away.

Police officers searched Petitioner's house on September 28, 2009, for evidence after the shooting.  A box of twenty .22 caliber rounds was found in a bag inside a sofa in the backyard.  Senior Deputy Marvin Gomez ("Senior Deputy Gomez") and Deputy Andrew Avila spoke to Petitioner at his residence.  Petitioner told the police officers that Elizalde had invited him to the party and informed Petitioner that Nortenos from Delano would be at the party.  Elizalde promised, however, that they were going to "keep everything cool."  Petitioner said he felt tension when he arrived at the party and saw many attendees wearing red.

Petitioner stated that he decided to leave Elizalde's house once beer ran out and people began drinking hard liquor.  Petitioner explained that "[a]ll the chaos started happening" when he walked out through the garage.  Petitioner heard people yelling "fuckin' scrapes [*sic*]" and he left.  Petitioner was wearing a Steelers jersey with the number 10, so he assumed that individuals yelling "scrapes [*sic*]" thought he was involved in a Southern gang.  Although Petitioner heard one gunshot, he did not realize someone had been shot.  When he arrived home, his "old lady" told him that she heard gunshots on the street right behind the house.  Petitioner spent that night in an abandoned house down the street.  He denied shooting anyone or having a gun on him.

At trial, Senior Deputy Gomez testified as the prosecution's gang expert.  The parties stipulated that the "Okie Bakers" were a criminal street gang whose primary activities were

---

[5] The record does not reflect what drew René's attention away from the fight between Daniel and Rivas.
[6] René was shot in the upper abdomen and underwent three surgeries during his month long hospitalization.

murder, attempted murder, illegal possession of guns, drug sales, carjacking, and drive-by shootings. Senior Deputy Gomez explained that the "Okie Bakers" were a Southern Hispanic street gang that claimed allegiance to the Mexican Mafia prison gang. Nortenos were their arch rivals and claimed allegiance to the Nuestra Familia prison gang.

Senior Deputy Gomez stated that throwing gang signs at someone is a form of disrespect. "Scraps" or "scrapas" is a term used by Nortenos to disrespect Southern Hispanic gang members. Based on his research, training, and experience, Senior Deputy Gomez opined that Petitioner and his two codefendants were members of the "Okie Bakers" gang. He also opined that the shooting was done in association with the "Okie Bakers" gang, based on the fact that it involved three known gang members: Petitioner, Rivas and Torres.

## II.    Procedural Background[7]

On July 12, 2010, a jury in the California Superior Court for the County of Kern found petitioner guilty of the following offenses: (1) attempted murder (Cal. Penal Code §§ 664/187); (2) assault with a firearm (Cal. Penal Code § 245(a)(2)); (3) felon in possession of a firearm (former Cal. Penal Code § 12021(a)(1)); and (4) unlawful possession of ammunition (former Cal. Penal Code § 12316(b)(1)). The jury found Petitioner not guilty of active participation in a criminal street gang (Cal. Penal Code § 186.22(a)). On March 4, 2011, the trial court sentenced Petitioner to life with the possibility of parole, plus a consecutive sentence of 25 years to life. The court also imposed, but stayed, custody terms of three years each for the assault with a firearm, felon in possession of a firearm, and unlawful possession of ammunition counts.

Petitioner filed an appeal with the California Court of Appeal, Fifth Appellate District, which affirmed the judgment on July 1, 2013. On August 14, 2013, Petitioner filed a Petition for Review in the California Supreme Court. The Petition was denied on October 16, 2013.

---

[7] The following information is derived from the state court records lodged by Respondent in his response.

On October 16, 2014, Petitioner filed a state habeas petition with the California Supreme Court. The Court denied the petition on January 14, 2015. On January 9, 2015, Petitioner filed a petition for writ of habeas corpus in this Court; Respondent answered on May 13, 2015, and Petitioner filed a traverse on July 10, 2015.

### III. <u>Standard of Review</u>

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320, 322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed after April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v.*

*Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). Petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

Petitioner raised the *Wheeler/Batson*, prosecutorial misconduct, and ineffective assistance of counsel issues in his state habeas petition. Because the California Supreme Court summarily denied review, the Court must "look through" the summary denial to the last reasoned decision.

7

*Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991). The last reasoned opinion for each of these issues was that of the California Court of Appeal.

### IV.     *Batson/Wheeler*[8] Motion

Petitioner first contends that the trial court violated his right to Equal Protection under the Fourteenth Amendment when the trial court denied his *Batson/Wheeler* motion, challenging the prosecutor's peremptory strike of a juror, Doris O. Respondent responds that the state court appropriately determined that the prosecutor did not strike the juror for impermissible reasons.

### A.   Standard of Review

To examine Petitioner's challenge to the peremptory strike on Doris O. the Court must perform a three-step analysis. First, defendant needs to present a prima facie showing of purposeful discrimination "by showing that the totality of the relevant facts give rise to an inference of discriminatory purpose" in the prosecutor's use of a peremptory challenge. *Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986). If established, the burden shifts to the prosecutor to present a race-neutral justification for the strike. *Id*. at 94. "Finally, the court must decide, in light of the race-neutral justification offered by the State, whether the State engaged in purposeful discrimination when it exercised the peremptory strike." *Castellanos v. Small*, 766 F.3d 1137, 1146 (9th Cir. 2014) (citing *Batson*, 476 U.S. at 98). *Wheeler* is the California Supreme Court's analogous decision to *Batson*. *Id*. The burden of proving "the existence of purposeful discrimination" is on the defendant. *Batson*, 476 U.S. at 93.

### B.   State Court Opinion

The California Court of Appeal summarized the facts as follows:

> Doris O. related that she was a yard supervisor for the Wasco School District. She was married, had four children, one of who[m] was still in high school, and six grandchildren. According to her answers to the questions

---

[8] *Batson v. Kentucky*, 476 U.S. 79 (1986); *People v. Wheeler*, 22 Cal.3d 258 (1978), overruled by *Johnson v. California*, 545 U.S. 162, 173 (2005).

contained in the confidential questionnaire, neither she nor anyone close to her had been the victim of gang violence or accused of being in a gang, nor had she witnessed or investigated a gang crime. . . .

The prosecutor [ ] questioned Doris O. and asked whether she watched over children when they went out on recess. She responded that she had been a yard supervisor for 18 years at different schools in Wasco. Presently, the children were kindergarten through sixth grade. When the prosecutor asked if she ever watched over older children, "like seventh, eighth grade, high school," she responded that she had before, but not high schoolers.

After the parties passed for cause, the prosecutor accepted the panel of 12 jurors four times. After the defense's next joint strike, Doris O. was moved into the jury box. The prosecutor immediately excused her. Shortly after, court adjourned for the weekend.

The following Monday morning, at the outset of the next court session, counsel for Rivas brought a *Batson/Wheeler* motion on behalf of the defendants jointly on the ground that six of the prosecutor's seven peremptory challenges were used against women, of whom four (Doris O., Debra R., Rosa H., and Rafaela O.) were Hispanic females. The trial court noted that the prosecutor had also excused a Hispanic male.

After the trial court outlined the analytical steps of a *Batson[/]Wheeler* motion and a brief summary of requirements of the first step, the trial court found the motion was timely, and that a prima facie showing had been made. Accordingly, it asked the prosecutor for an explanation of his strikes against females. This ensued: . . .

"[Doris O.] works with children, seventh and eighth graders, in Wasco. I know Wasco. I know Wasco to be an area that has Hispanic gang populations, especially at that age group.

"She did mention that. She did mention something about seventh and eighth graders and kids being involved in that - - in that type of activity, which is the reason why I struck her. . . .

"THE COURT: All right. Miss Kim [counsel for Petitioner], any comments?

"MS. KIM: No, Your Honor.

"THE COURT: Mr. Carter [Counsel for Torres]?

"MR. CARTER: . . . As to [Doris O.], I believe she had indicated she mostly dealt with the younger groups of children; that she had, in the past, done some junior high. I believe when she indicated that's when they mostly got into - - started being approached by the gangs and that becoming a problem. But she no

9

longer - - but she dealt mostly with the young people.  She may have indicated there was - - they had started to be influenced by gangs in the later years, but, again, just because she lives in Wasco, may have, and teaches in school, I'm not sure where the bias comes from.  Just the fact that she knows about gangs in Wasco, just I think the statement by the District Attorney that he knows that there are gang problems in Wasco, I'm not sure that's sufficient cause to show that everybody from Wasco ought to be excluded. . . .

"THE COURT: Mr. Revelo [counsel for Rivas]?

"MR. REVELO: I believe that [Doris O.] said that she worked with children that were not high schoolers and not seventh, eighth grade.  So I don't think … that's accurate.

"There was another individual, also female, that used to be a teacher and now is a stay-at-home momma, and she was the one that said she was working with seventh and eighth graders.  That's my recollection.  Maybe I'm wrong. . . .

"THE COURT: All right.  The Court will note that there are four Hispanics on the panel now.  Mr. Louie has accepted the panel five times.

"Regarding the jurors, the Judge has evaluated Mr. Louie's explanation.  I am satisfied with each explanation and finding the explanations sincere and genuine, and the motion is denied at this point.

"The Court is aware of the fact that Mr. Louie [the prosecutor] has bumped almost all of his peremptory challenges used on women. [*Sic.*]

"Four of those on Hispanic females.  The Court is satisfied as to the record given by Mr. Louie as to [Rosa H., Debra R., Rafaela O., and Doris O.], those are the Hispanic females, as well as [Aida S. and Linda B.], who appeared to be Anglo females.

"The Court finds a valid reason for each one."

*People v. Coronado* (Cal. Ct. App. July 1, 2013) (No. F062077) at 26-32.

The Court of Appeal proceeded through the three step *Batson/Wheeler* analysis and found at the first step that defense counsel made a prima facie case for discrimination with respect to women.  Moving to step two, the California Court of Appeal looked at the prosecutor's stated reasons for dismissing Doris O., specifically that she worked with seventh and eighth grade students that could be involved in gangs and in an area with a Hispanic gang population.  The Court of Appeal determined that, assuming the prosecutor's stated reasons for excusing Doris O.

10

were true, the challenge did not violate Petitioner's Constitutional rights because the stated reasons were race neutral.

At step three, the Court of Appeal detailed the facts surrounding Doris O's dismissal:

> Here, the prosecutor stated he excused Doris O. because she worked with seventh and eighth graders in Wasco; he knew Wasco to be an area with Hispanic gang populations especially at that age group; and that Doris O. mentioned something about seventh and eighth graders being involved in that type of activity. In reality, although Doris O. said she had watched over seventh and eighth grade children in the past, she currently supervised kindergarten through sixth grade children. She was never asked, nor did she say anything about gangs or gang activity, let alone seventh and eighth graders or children being involved in that type of activity. Thus the prosecutor's stated reasons were, in part, unsupported by the record.

> But further review of the record supports the conclusion that the prosecutor, counsel for Torres and the trial court confused a portion of the prosecutor's statements attributed to Doris O., with statements made by Primavera B., another prospective juror questioned after Doris O. Primavera B. stated she had worked with seventh and eighth grade students in the area and that they were subject to gang influence. . . . She was then questioned about an answer on her jury questionnaire in which she answered yes to the question of whether she had ever witnessed or investigated a gang crime. According to Primavera B., she was in downtown Bakersfield several years earlier and was about a half block from where a homicide occurred. She saw gunfire, but not the actual shooting, and did not know what had happened in the case, other than what she had read in the newspaper. Primavera B. thought it was a gang crime from "what they were wearing as they ran past me" and that the men were "[p]robably Hispanic or white."

> Primavera B. then said she would have "a bit of a hard time" being unbiased in the present case, "[n]ot because of that incident, but because I work with children and I see a lot of the gang-life influence." Primavera B. taught for a few years on the east side of Bakersfield before becoming a stay-at-home mom. According to Primavera B., the gangs targeted "good kids … that have a future … [and] … took their futures away." Primavera B. stated that the "Junior High. Seventh grade. Eighth grade" kids would "come at the beginning of the school year really excited about learning, and then they just kind of go downhill." When quested by Coronado's counsel, Primavera B. stated that she had a "really, really negative view of gangs" and that gangs "are nothing but criminal activity." Rivas counsel continued the questioning and Primavera B. explained that she grew up in Delano where there was a log of gang activity, especially in junior high. . . .

> After telling Primavera B. to return the following morning, counsel for Torres state that the court had not offered him an opportunity to challenge her and

11

that he wanted the record to reflect that he would challenge her for cause. Both counsel for [Petitioner] and Rivas joined in the request. The prosecutor objected to the challenge for causes stating that "everyone in the community doesn't like gangs," and he thought Primavera B. was articulating that, but that she had said she could consider only the evidence and follow the law. . . . The following morning, Primavera B. was removed for cause.

*Coronado* (No. F062077) at 35-38.

The Court of Appeal noted that the prosecutor's statements about Doris O. were not entirely accurate because she neither worked with seventh and eighth grade students, nor mentioned gang activity in her area. However, the Court determined that the prosecutor's stated reasons for challenging the other six jurors were accurate and non-discriminatory.

### C.  The State Court's Decision Regarding the *Batson/Wheeler* Motion was Within the Confines of Constitutional Law.

In a *Batson/Wheeler* motion, "the issue is not whether there is a pattern of systematic exclusion; rather, the issue is whether a particular prospective juror has been challenged because of group bias." *People v. Avila*, 38 Cal.4th 491, 549 (2006). Because a ruling on a *Batson/Wheeler* motion necessarily implicates a court's own observations, the reviewing court must give considerable deference to the trial court's findings and, if the record suggests grounds on which the prosecutor might reasonably have challenged the prospective juror at issue, its duty is to affirm. *Id.* "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003).

Petitioner asks the Court to overturn the Court of Appeal's majority opinion in favor of the dissenting opinion. In the dissenting opinion, the Judge noted that the record does not indicate that the prosecutor was confused or made a mistake, and the trial court did not evaluate the prosecutor's explanation. *Coronado* (No. F062077) at 63 (Detjen, J., dissenting).

In analyzing the effect of a prosecutor's statements, the Ninth Circuit explained that "there is a 'fine distinction between a prosecutor's false statement that creates a new basis for a strike that otherwise would not exist and a prosecutor's inaccurate statement that does nothing to change the basis for the strike.'" *Aleman v. Uribe*, 723 F.3d 976, 982 (9th Cir. 2013) (quoting *Jamerson v. Runnels*, 713 F.3d 1218, 1232 n.7 (9th Cir. 2013)). While a prosecutor's credibility is undermined if the prosecutor gives an explanation for a peremptory challenge that "mischaracterizes a juror's testimony in a manner completely contrary to a juror's stated beliefs," a good faith mistake, "such as an innocent transposition of juror information, . . . does not support the conclusion that the prosecutor's explanation is clearly not credible." *Id.*

Here, the California Court of Appeal affirmed the trial court's *Batson/Wheeler* ruling on the ground that the prosecutor made a mistake, which was not evidence of racial bias. "For a prosecutor to eliminate a prospective juror by peremptory strike based on an honest mistake as to what the juror had said in *voir dire* is not the same, for constitutional purposes, as striking the juror based on an intentionally discriminatory motive." *Id.* The Court of Appeal determined that, after five days of *voir dire*, the prosecutor confused two female jurors who both worked with children. Although Doris O. was not working with seventh and eighth graders at the time of the trial, she had previously worked with children in that age group. Given the length of *voir dire* and the similarities between Doris O. and Primavera B.'s comments, the trial court properly found the prosecutor made a mistake by transposing the responses of these jurors. "Such 'innocent transposition makes little headway toward the conclusion that the prosecutor's explanation was not clearly credible.'" *Id.* at 983 (quoting *Rice v. Collins*, 546 U.S. 333, 340 (2006)).

The dissenting opinion raised concerns about the prosecutor's credibility regarding his reasons for striking Doris O.; however, this analysis does not "compel the conclusion that the trial court had no permissible alternative but to reject the prosecutor's race-neutral justifications and

conclude" there was a *Batson/Wheeler* violation. *Rice*, 546 U.S. at 341. "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Hernandez v. New York*, 500 U.S. 352, 369 (1001) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985) (internal quotation marks omitted)). Here, the trial court credited the prosecutor's explanation of the evidence, which was permissible.

Because there is no indication that the trial court or the Court of Appeal acted contrary to clearly established federal law in applying the *Batson/Wheeler* test, the state court's decision in concluding that the prosecutor's peremptory challenge of Doris O. was not pretextual was within the confines of federal constitutional law.

## V. **Prosecutorial Misconduct**

Petitioner contends that the prosecutor violated his rights by vouching for his witnesses in the case and appealing to the "passions and prejudices of the jury." Petitioner maintains that these errors had a "substantial and injurious effect or influence on the jury's verdict." Respondent responds that the Court of Appeal's denial of Petitioner's claim of prosecutorial misconduct was not objectively unreasonable.

### A. **Standard of Review**

A prosecutor's "misleading and inflammatory arguments" to a jury can rise to the level of a federal constitutional violation. *Sechrest v. Ignacio*, 549 F.3d 789, 807 (9th Cir. 2008) (citing *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986)). A prosecutor's comments violate the Constitution when they "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181-82 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)) (internal quotation marks omitted). "[T]he appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" *Id.* (quoting *Donnelly*, 416 U.S. at 642). To determine whether

a prosecutor's comments rendered a trial fundamentally unfair, the Court must "examine the entire proceedings and place the prosecutor's statements in context." *Tobey v. Uttecht*, 601 Fed. Appx. 498, 499 (9th Cir. 2015) (unpublished) (citing *Greer v. Miller*, 483 U.S. 756, 765-66 (1987)).

## B. State Court Opinion

In his closing argument, Rivas' counsel compared Harry Houdini, who performed magic tricks by misdirecting people, to the police officers in this case. *People v. Torres, et al.* (Cal. Super. Ct. June 22, 2010) (No. BF129529B & C) at 1957. Counsel stated that what he was "going to try to do [in closing argument] . . . is show you that those things are tricks. That the truth is here, and there's enough evidence to find Mr. Rivas not guilty, and also the other two young men that have been charged." *Id.* Counsel noted that the pictures in the photo lineups of the three defendants stood out from the rest of the pictures in the lineup and stated Senior Deputy Gomez "doing lineups, he wasn't really trying to tell anybody to pick these three. Oh, no, not at all. But was he doing that? You saw the pictures, right?" *Id.* at 1959. Counsel argued that the government was trying to "sell [the jury] a story." *Id.* He told the jury,

> [y]ou see the little lies that I'm piling all up, and the problem becomes apparent. The truth becomes clear. These people who represent the government have a theory of what happened that night, and no matter what happens, no matter what the truth, no matter how many people they hurt, no matter how many rights they're going to trample upon and how many people they're going to come in, destroy, and demonize, they're going to get you to buy what they tell you is the truth.

*Id.* at 1960. Rivas' counsel maintained

> that sometimes when institutions are corrupted by people who think they are doing the right thing, we have to assume that what happened that night and the investigation that followed the shooting of René Serrano took the direction that it took not because they wanted to frame these three men because they hated them, but simply because at some point it became sort of the only possible conclusion of what they were doing.

*Id.* at 1982-83.

15

In his rebuttal to these remarks during closing argument, the prosecutor stated "what the People, the District Attorney's Office, and law enforcement does is not try to frame and convict innocent people" and "not try to . . . steam roll and convict people who are not guilty." *Coronado* (No. F062077) at 54. The Court of Appeal decided that the prosecutor did not personally vouch for the government with these statements. Additionally, the Court of Appeal found that the prosecutor was not trying to prejudice the jury when he stated that the job of the District Attorney's Office and law enforcement is to "protect and serve by investigating, prosecuting dangerous crimes, whether they're gang crimes or other types of crimes, so that people in our community feel safe, can go to the mall, can go to the movies, can live lives." *Id.* Instead, the Court of Appeal determined that the prosecutor explained the role of government and law enforcement to counter defense counsel's inference that Petitioner and his co-defendants were unjustly framed. *Id.* at 55. The Court of Appeal found there was "no reasonable likelihood the jury construed or applied the prosecutor's remarks in an objectionable fashion," and the remarks did not warrant reversal of the jury verdict. *Id.*

### 1. Vouching for Witnesses

Petitioner argues that the prosecutor did not vouch for specific witnesses in the case, but instead for his case as a whole. "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Weatherspoon*, 410 F.3d 1142, 1146 (9th Cir. 2005) (quoting *United States v. Necoechea*, 986, F.2d 1273, 1276 (9th Cir. 1993) (internal quotation marks omitted)).

Petitioner's argument is unavailing. The prosecutor "did not manipulate or misstate the evidence, nor did [he] implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Darden*, 477 U.S. at 182 (citing *Darden v. Wainwright*, 513 F. Supp.

947, 958 (M.D. Fla. 1981)).  The statements to which Petitioner objects were made *in response to* defense counsel's argument.  Indeed, the prosecutor's statements followed defense counsel's statements contending that the District Attorney's office and law enforcement framed Defendants.  Consequently, the California Court of Appeal's determination that the prosecutor did not personally vouch for any witness was neither contrary to, nor involves an unreasonable application, of federal law.

### 2.  Appeals to the Passion and Prejudices of the Jury

Petitioner contends that the prosecutor improperly argued that the jury should convict Petitioner to make the community safe.  Prosecutors cannot urge jurors to convict a defendant "in order to protect community values, preserve civil order, or deter future lawbreaking.  The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence." *United States v. Sanchez*, 659 F.3d 1252, 1256 (9th Cir. 2011) (quoting *United States v. Nobari*, 574 F.3d 1065, 1076 (9th Cir. 2009) (internal quotation marks omitted)).

Petitioner argues that the case at bar is similar to *Weatherspoon*, in which the prosecutor urged the jurors that convicting the defendant "is gonna make you comfortable knowing there's not convicted felons on the street with loaded handguns, that there's not convicted felons carrying around semiautomatic."  410 F.3d at 1149.  In *Weatherspoon*, the Ninth Circuit found that these statements spoke "to the potential social ramifications of the jury's reaching a guilty verdict." *Id.*

By contrast, here the prosecutor did not urge the jurors to convict Petitioner to protect the community.  Instead, the prosecutor argued that "[what] the People, the District Attorney's Office, and law enforcement does is not to try to frame and convict innocent people.  What we do is we try to protect and serve our community to prevent gang crimes." *Coronado* (No. F062077) at 52.  The prosecutor further argued that the job of the District Attorney's office and law

17

enforcement it "to protect and serve by investigating, prosecuting dangerous crimes, whether they're gang crimes or other types of crimes, so that people in our community feel safe, can go to the mall, can go to the movies, can live their lives." *Id*. The prosecutor's arguments were not "designed to encourage the jury to enter a verdict on the basis of emotion rather than fact," but to rebut the statements about the District Attorney's office and law enforcement made by defense counsel.

Thus, the Court finds that the Court of Appeal's conclusion that the prosecutor did not urge the jury to convict petitioner on the basis of appeals to the passion and prejudices of the jury was not contrary to, and did not involve an unreasonable application of, clearly established federal law.

**VI.    Ineffective Assistance of Counsel at Trial**

Petitioner contends that ineffective assistance of counsel violated his Sixth and Fourteenth Amendment rights because trial counsel failed to (1) request jury instruction CALCRIM 522; (2) argue imperfect self-defense during closing argument; and (3) bifurcate the gang issues in the case.

**A.  Standard of Review**

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the

time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient; and (2) prejudice as a result of such deficient performance. Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

## B. State Court Opinion

Petitioner raised his first two ineffective assistance of counsel claims in a petition for writ of habeas corpus filed in the California Supreme Court, which was summarily denied. Because petitioner raised these two issues first in his state habeas petition, which was denied without a written opinion, there is no reasoned state court opinion for the Court to review. Consequently, this Court must "perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable." *Haney v. Adams*, 641 F.3d 1168, 1171 (9th Cir. 2011) (internal citations omitted).

Petitioner must show that "there was no reasonable basis" for the California Supreme Court's ruling. *Id.* (quoting *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011) (internal quotation marks omitted)). "A habeas court must determine what arguments or theories could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court." *Id.* (internal quotation marks omitted).

Petitioner presented his third ineffective assistance claim on direct appeal before the

California Court of Appeal and the California Supreme Court. The California Supreme Court summarily denied the claim. The Court of Appeal stated:

> [b]ecause we disagree with [Petitioner's] contention that the trial court erred when it denied his motion to sever and bifurcate, we need not address his additional argument that counsel was ineffective for 'failing to present to the court the enormous amount of prejudicial gang evidence that would be introduced if the motion was denied.' [Petitioner] has failed to show that he would have achieved a more favorable result had the gang offense been severed and the gang enhancement allegations bifurcated. Thus, [Petitioner] cannot establish prejudice.

*Coronado* (No. F062077) at 59 (citing *Strickland*, 466 U.S. at 687).

## 1. Jury Instruction CALCRIM 522 and Imperfect Self-Defense

Petitioner argues that his counsel was ineffective because counsel did not (1) request CALCRIM No. 522 be added to the jury instructions, which instructs that premeditation may be negated by provocation; and (2) make an imperfect self-defense argument during closing argument. Petitioner appears to have taken his argument from a defense investigation summary attached to his state petition for writ of habeas corpus. The summary notes that Petitioner claimed someone else shot the victim, but raises the possible defense of imperfect self-defense and provocation as negating premeditation.

To prove the first prong of the *Strickland* test, deficient performance, a petitioner must demonstrate that counsel's performance "fell below an objective standard of reasonableness," or "outside the wide range of professionally competent assistance." 466 U.S. at 688, 690. Review is highly deferential and must focus on counsel's perspective at the relevant time. *Id.* at 689. The habeas court should initially assume that counsel's actions reflected sound trial strategy. *Pinholster*, 563 U.S. at 191. The court's analysis must proceed objectively and must affirmatively consider counsel's reasons for proceeding as he did. *Id.* at 196. "There are countless ways to provide effective assistance in any given case." *Strickland*, 466 U.S. at 689. The petitioner bears the heavy burden of overcoming the presumption that the challenged action

"might be considered sound trial strategy." *Id.* at 689 (quoting *Michel*, 350 U.S. at 101).

Counsel argued that there was insufficient evidence to establish Petitioner was the shooter in this case. In support of this argument, counsel presented Petitioner's statements to the police prior to his arrest. Counsel chose to present the defense that Petitioner did not shoot the victim, rather than to assert a provocation defense. Considering counsel's defense that Petitioner was not the shooter, it would not be reasonable for counsel to also argue that Petitioner was provoked or acted in imperfect self-defense. Counsel could not both argue that Petitioner did not shoot the victim *and* that he shot the victim in self-defense.

Petitioner has not carried his burden of proving that counsel's decision not to argue the defenses fell below an objective standard of reasonable attorney performance and that the outcome of the trial would have been different if counsel had argued these defenses. *See*, *e.g.*, *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (holding that establishing that counsel erred is not enough, and the petitioner must prove that counsel's representation was unreasonable under prevailing professional norms). Because Petitioner has failed to show a *Strickland* violation, the Court will recommend that his first two ineffective assistance of counsel claims be denied.

## 2. Bifurcation of Gang Issues

In his third ineffective assistance of counsel claim, Petitioner maintains that counsel did not present the trial court with all of the prejudicial gang evidence that could be introduced at trial if counsel's motion to exclude this evidence failed. Petitioner states that there was no valid tactical reason for not presenting all of the evidence available to counsel at the hearing.

Counsel filed a motion seeking to bifurcate the gang enhancements and gang allegations for trial, which was rejected by the trial court. Despite the denial of the motion and presentation of the evidence to the jury, the jury returned not guilty verdicts on the substantive gang offense and gang allegations. Based on the jury's verdict, it was reasonable for the Court of Appeal to

find that Petitioner failed to show he would have achieved a more favorable result had the gang allegations been bifurcated.  Even assuming counsel erred in failing to present all of the pertinent evidence to the trial court, Petitioner has not demonstrated he suffered any prejudice because the jury found him not guilty of the gang offense.  Therefore, Petitioner cannot establish a *Strickland* violation.  For these reasons, the Court will recommend that Petitioner's third ineffective assistance of counsel claim be denied.

**VII.    Ineffective Assistance of Counsel at Pre-Trial Hearing**

Petitioner claims his counsel was ineffective during a pretrial hearing regarding his conversation with Senior Deputy Gomez.  Specifically, Petitioner claims that counsel failed to impeach Senior Deputy Gomez at the pretrial hearing with the following facts: (1) Petitioner answered his door with his hands raised, and (2) police helicopters were flying over Petitioner's house.

Petitioner raised this claim for the first time in his petition for writ of habeas corpus before the California Supreme Court, which summarily denied the claim.  Because there is no reasoned state court opinion on this claim, the Court will "perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable."  *Haney*, 641 F.3d at 1171 (internal citations omitted).

Although counsel did not question Senior Deputy Gomez regarding how Petitioner answered the door or about the police helicopters, counsel *did* cross examine the Senior Deputy regarding the circumstances of the police interrogation.  Even if the Court considers counsel's performance to be deficient at the pretrial hearing, Petitioner has not suffered any prejudice.

Counsel used the statement Petitioner gave Senior Deputy Gomez to support Petitioner's defense that someone else shot the victim.  Counsel was thus able to mitigate the potential prejudice of the statement by using it as evidence of Petitioner's innocence.  Accordingly, the

Court of Appeal's denial of Petitioner's ineffective assistance of counsel claim was not objectively unreasonable.

**VIII.** **Cumulative Error**

Finally, Petitioner contends that when counsel's multiple acts and omissions are considered together, they constitute cumulative error, requiring a finding of "reversible and prejudicial error." Because these findings and recommendations conclude that Petitioner has failed to prove any instance of ineffective assistance under the *Strickland* requirements, there is no cumulative attorney error from which to find ineffective assistance.

**IX.** **Summary**

As long as fair-minded jurists could disagree on the correctness of the state court's determination that a claim lacks merit, a federal court cannot provide habeas relief. *Harrington*, 562 U.S. at 101; *Yarborough*, 541 U.S. at 664. Here, the petition fails to establish that the state court unreasonably applied clearly established federal law or unreasonably determined the facts in light of the evidence presented at trial.

**X.** **Certificate of Appealability**

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances. *Miller-El v. Cockrell*, 537 U.S. at 335-36. The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

> (c) (1) Unless a circuit justice or judge issues a certificate of

23

appealability, an appeal may not be taken to the court of appeals from—

> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

> (B) the final order in a proceeding under section 2255.

> (2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

> (3) The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the undersigned concludes that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court declines to issue a certificate of appealability.

## XI.    Conclusion and Recommendation

Based on the foregoing, the undersigned recommends that the Court dismiss the Petition for writ of habeas corpus with prejudice and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District

Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order. *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:  __**October 23, 2017**__                    _____ /s/ *Sheila K. Oberto* _____
                                                    UNITED STATES MAGISTRATE JUDGE